1                                                 HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7                       UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
                            AT TACOMA

8

9 PEGGY JOHNSON,                       CASE NO. C14-5832RBL

                     Plaintiff,            ORDER

10

           v.

11

MASON COUNTY, et al.,

12

                   Defendants.

13

14       THIS MATTER is before the Court on the following Motions: Plaintiff Peggy Johnson's

15 Motion for partial summary judgment [Dkt. #100]; Defendant Healthcare Delivery and Aimee

16 Wagonblast's Motion for Summary Judgment [Dtk. #105]; and Defendant Mason County's

17 Motion for Summary Judgment [Dtk. #118]. The case arises from Jimi Johnson's suicide at the

18 Mason County Jail in April 2013. Plaintiff Peggy[1] Johnson is Jimi's grandmother.

19       Jimi Johnson was mentally ill, suffering from schizoaffective disorder, schizophrenia,

20 and psychosis. Peggy claims Jimi had a heightened risk of self-harm and suicide consistent with

21 these conditions. When Jimi was first incarcerated at Mason County, in August 2012, Peggy

22

23

24         [1] For clarity, this Order will refer to Peggy and Jimi Johnson by their first names. No
disrespect is intended.

1  claims she "called everyone she could think of" to alert the jail that Jimi was a risk, and that he

2  should be watched. Jimi was released after three months and was soon hospitalized as suicidal

3  and having psychotic hallucinations. He was referred to Defendant Behavioral Health Resources,

4  who determined that he was not eligible for involuntary detention and released him to Peggy.

5  Jimi attempted suicide in late October and was involuntarily detained at BHR's in-patient center.

6  He remained there until November 6, 2012. In December, he again attempted suicide and was

7  again hospitalized, where he was continually reported to be suicidal. Nevertheless, because of his

8  criminal history, BHR released him to Peggy rather than sending him to an in-patient mental

9  health care facility.

10      Jimi was arrested and incarcerated again in January 2013. Mason County did a medical

11  assessment and determined that he was likely on drugs. Peggy again sought to inform everyone

12  she could about Jimi's mental health problems and his suicidal tendencies.

13      Jimi repeatedly denied being suicidal, though the Jail Mental Health Professional did not

14  chart her contact with him. While he was in jail, Jimi reported trouble sleeping, hearing voices,

15  and anxiety to employees of defendant Healthcare Delivery Systems, a private entity hired by

16  Mason County to provide medical and psychological care to its inmates.  An HDS employee,

17  Melanie Figueredo, met with him on February 1. Over the next month, HDS reviewed Jimi's

18  records to determine whether he should be given the anti-psychotic drug Haldol. HDS did not

19  obtain Jimi's records from his doctor, Dr. Cavendish, until March 4. Cavendish informed HDS

20  that Jimi's "basic mental state was psychotic and suicidal," whether or not he was "dabbling" in

21  illegal drugs. Defendant Wagonblast, ARNP (another HDS employee) reviewed Jimi's records

22  and met with him on March 11. Jimi told Wagonblast that he had a plan to hang himself, and his

23

24

1   records confirmed that he was suicidal and psychotic. Nevertheless, she discontinued his Haldol

2   prescription, and prescribed Zoloft instead.

3        By early April, Jimi's condition deteriorated and he assaulted another inmate. He was

4   moved to a maximum security cell, where, according to Peggy, other inmates could hear his cries

5   for help. Peggy claims that Jimi received no meaningful help for his mental illness at the jail.

6   Peggy saw Jimi at a court appearance on April 22 and could see that he was in a mental health

7   crisis, and continued to try to warn the jail of that fact. She claims her efforts were ignored. That

8   night, he hung himself.

9        Peggy sued the County and its employees, Behavioral Health Resources and Marsha

10  Weaver, and Healthcare Delivery Systems and Aimee Wagonblast, asserting §1983 (Eighth

11  Amendment) and negligence claims.

12       The Mason County defendants seek summary judgment, arguing that Peggy cannot meet

13  her obligation to prove jail staff actually knew of an excessive risk to Jimi's safety, and that they

14  acted (or failed to act) in deliberate disregard of that known risk. They emphasize that Jimi

15  denied suicidal thoughts. They also argue that the individual defendants (jail personnel) are

16  entitled to qualified immunity, and that Jimi's municipal liability (*Monell*) claim fails because

17  Peggy cannot establish that Jimi's injuries were caused by a Mason County policy or practice.

18       HDS and Wagonblast also seek summary judgment. They argue that there is no evidence

19  that HDS or Wagonblast were deliberately indifferent to Jimi's medical needs.

20       Peggy seeks partial summary judgment. She claims Wagonblast's expert, Kimberly

21  Pearson, RN, is not qualified as a matter of law to opine about the standard of care for an ARNP.

22  Thus, she claims, Wagonblast does not have any evidence that her conduct met the applicable

23  standard of medical care as a matter of law.

24

**A.  Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. At 251-52.  The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

**B.  Mason County's Motion is Denied.**

Mason County's defense to Peggy's Eighth Amendment claim is primarily that Jimi denied he was suicidal. It claims that individual defendants, Hilyard and Haugen, had only limited involvement with Jimi and thus cannot have been a cause of any constitutional violation. At the same time, they argue that the County cannot be liable because Peggy can point to no policy, practice or custom leading to Jimi's suicide. Curiously, they do not address, at all, the ample evidence in the record that jail personnel, mental health professionals, and other inmates

1  were aware of Jimi's mental health crisis, that Peggy informed everyone she could that he was

2  suicidal, and that in response, the jail staff did almost nothing.

3      1.  Qualified Immunity

4          Qualified immunity "shields an officer from suit when she makes a decision that, even if

5  constitutionally deficient, reasonably misapprehends the law governing the circumstances she

6  confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  The Supreme Court has endorsed

7  a two-part test to resolve claims of qualified immunity: a court must decide (1) whether the facts

8  that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the

9  "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*

10 *v. Callahan*, 553 U.S. 223, 232 (2009).[2]  Qualified immunity protects officers not just from

11 liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and

12 thus, the claim should be resolved "at the earliest possible stage in litigation." *Anderson v.*

13 *Creighton*, 483 U.S. 635, 640 n.2 (1987).  The purpose of qualified immunity is "to recognize

14 that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to

15 make difficult decisions in challenging situations, thus disrupting the effective performance of

16 their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  Because "it is

17 inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude

18 that probable cause [to arrest] is present," qualified immunity protects officials "who act in ways

19 they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th

20 Cir. 2011) (quoting *Anderson*, 483 U.S. at 631).

21

22

23         [2] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier* requiring

24 district courts to decide each question in order.

Viewed in the light most favorable to Peggy, the evidence establishes fairly clearly that Jimi's mental health needs were not met, if not flatly ignored. For purposes of this motion, Peggy has established that Jimi's Eighth Amendment rights were violated.

On this record, and in this context, the second inquiry—whether it was clearly established that an obviously mentally ill, suicidal prisoner's rights would be violated if he were not given appropriate medical care—is only slightly more difficult. It is clearly established that a prisoner has a right to medical care while in custody. There are no cases holding or suggesting that a jailor can ignore other evidence once a mentally ill prisoner simply denies he is suicidal.   There is ample evidence from which a jury could find that Jimi was in fact mentally ill, psychotic, and suicidal, and that the Mason County Jail knew of that fact. A jury could find that this suicide was not, or should not have been, a surprise to those in charge of ensuring that such instances do not happen. The reasonableness of the efforts made to prevent this outcome are a jury question. The motion for summary judgment on qualified immunity is DENIED.

2. *Monell* Liability

Mason County[3] argues that Peggy's *Monell* claim fails because there is no evidence that it had a policy or practice of ignoring a prisoner's mental health issues.

To establish municipal liability under § 1983, a plaintiff must show that the defendant's employees or agents acted pursuant to an official custom, pattern, or policy that violated the plaintiff's civil rights, or that the entity ratified the unlawful conduct. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91, 98 S. Ct. 2018 (1978); *see also Larez v. City*

---

[3] Defendant Hanson is named only in his official capacity, and Peggy properly concedes that his presence in the case is duplicative. Peggy's claims against Kevin Hanson are DISMISSED with prejudice.  Mason County's objections to the length of the filings are noted and denied. Their Motions to strike various filings are DENIED.

*of Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). A municipality may be liable for a "policy of inaction" where "such inaction amounts to a failure to protect constitutional rights." *Lee v. City of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Municipal liability for inaction attaches only where the policy amounts to "deliberate indifference." *Id.* The custom or policy of inaction, however, "must be the result of a conscious or deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* (citations and internal punctuation omitted). Thus, to impose liability on a local government entity for failing to act to preserve constitutional rights, a § 1983 plaintiff must allege that: (1) a municipality or its employee deprived plaintiff of a constitutional right; (2) the municipality has customs or policies that amount to deliberate indifference; and (3) those customs or policies were the "moving force" behind the constitutional right violation. *Id.* at 681–82.

A municipality is not liable simply because it employs a tortfeasor. *See Monell*, 436 U.S. at 691. A municipality may not be held liable for the torts of its employees unless they were acting pursuant to an official policy or longstanding custom or practice. *See Botello v. Gammich*, 413 F.3d 971, 978–79 (9th Cir. 2005) (citing *Monell*, 436 U.S. at 691; *Bd. of Cty. Cmm'rs v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292 (1986); and *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003)).

There is ample evidence from which a jury could find that the jail's conduct over the course of Jimi's incarceration was the result of a pattern of "deliberate indifference" to its prisoners' mental health issues and the need for medical treatment. The failure to have a suicide watch, and leaving materials that could be used to accomplish a suicide, alone are evidence of an

1    institutional shortcoming. Peggy outlines a series of other It is perhaps telling that the defendants

2    do not articulate what they actually did, or argue that there was nothing they could have done, to

3    prevent Jimi's suicide.  On the other hand, Peggy has outlined a host of institutional, municipal

4    actions and inactions that a reasonable jury could find amounted to a policy of indifference. The

5    motion to dismiss the *Monell* claim on summary judgment is DENIED.

6          Mason County's Motion for summary judgment on Peggy's negligence claim is similarly

7    DENIED, though Mason County is correct as to the measure of damages available for that claim.

8    Peggy's status as Jimi's grandmother is not a bar to her constitutional claims.

9    **C.  HDS's Motion is Denied.**

10         HDS[4] and Wagonblast argue primarily that while Wagonblast knew (as of March 11) that

11   Jimi was mentally ill and psychotic, she did not know that he had a heightened risk of suicide.

12   Like Mason County, she denies that *Jimi ever told her* that he was thinking of killing himself.

13   These defendants claim there is "zero evidence" that she knew or should have known that he had

14   made suicidal statements, or that he was at an acute or immediate risk of suicide. She claims she

15   ensured he had medication (though she does not directly address the change from Haldol to

16   Zoloft, or plaintiff's evidence that that was likely to increase his problems). She claims she is

17   "free from liability" because she "responded reasonably," as a matter of law.  She may ultimately

18   prevail of the first two of those three points, but she cannot prevail on the third. As is often the

19   case where the issue is reasonableness, there are factual issues for the jury on Peggy's claims

20   against Wagonblast. Her motion for summary judgment on Peggy's §1983 claim is DENIED.

21

22   ──────────────────

23        [4] HDS also argues that Peggy's *Monell* claim against it should be dismissed as a matter of
     law. Peggy does not respond to this aspect of the motion and it is GRANTED. The *Monell* claim
     against HDS is dismissed with prejudice.

24

1    Finally, HDS seeks summary judgment on Peggy's medical negligence claim. The

2  motion turns in part on the HDS defendants' own expert's opinion that the standard of care was

3  met. Peggy, in turn, argues that that expert—an RN, not an ARNP—is not qualified to so opine.

4  That issue is addressed below. But the Motion for Summary Judgment on the medical negligence

5  claim on the basis of the moving party's own expert's opinion is DENIED.

6  **D.  Peggy Johnson's Motion is Denied.**

7    Peggy claims that because Wagonblast's expert is not qualified as a matter of law to

8  opine about her adherence to the standard of care, she (Peggy) is entitled to judgment as a matter

9  of law on her negligence claim against Wagonblast.  She argues that an RN cannot testify as to

10  an ARNP's standard of care, citing *Quiggins v Corizon, Inc*., 2103 WL 486636 at *4 (W.D. Ky.,

11  2013).  She also argues that HDS is vicariously liable for Wagonblast's negligence as matter of

12  law.

13    HDS argues that their expert, Pearson is qualified, reciting two pages of her experience

14  and training on these issues in the California correctional system. The Court agrees that Person

15  can testify, subject to cross-examination; any mismatch between her qualifications go to the

16  weight not the admissibility of her opinion. Furthermore, there remain questions of fact over the

17  reasonableness of Wagonblast's conduct, as was the case with her own motion for Summary

18  Judgment, discussed above.

19    Peggy's motion for summary judgment on her negligence claim against HDS and

20  Wagonblast is DENIED.

21  >>>

22  >>

23  >

24

1                                    ***

2       This is not a summary judgment case. The Motions are DENIED.

3       IT IS SO ORDERED.

4       Dated this 27th day of February, 2017.

5

6       _____

7                              Ronald B. Leighton
                               United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24